# In the United States Court of Federal Claims

No. 21-1494C
Filed: September 30, 2021
Reissued: October 14, 2021[*]

---

**SQUIRE SOLUTIONS, INC.,**

*Plaintiff*,

v.

**UNITED STATES,**

*Defendant.*

---

*Alan Grayson*, Windermere, FL, for the plaintiff.

*Sheryl L. Floyd*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for the defendant.

## MEMORANDUM OPINION

***HERTLING*, Judge**

The plaintiff, Squire Solutions, Inc. ("Squire"), filed this post-award bid protest to challenge the Department of the Navy's evaluation of the plaintiff's proposal and the Navy's decision not to award a contract to the plaintiff. The plaintiff had submitted its proposal in response to a Broad Agency Announcement ("BAA") issued by the Department of Defense ("DoD") under the Small Business Innovation Research ("SBIR") program. The Navy evaluated the plaintiff's proposal and then re-evaluated it as a corrective action after Squire filed an agency-level protest.

The plaintiff raises two claims. First, it alleges that the Navy's evaluation and re-evaluation were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Second, it alleges that the re-evaluation was tainted by bias in retaliation for Squire's

---

[*]Pursuant to the protective order in this case, the Court initially filed this opinion under seal on September 30, 2021, and directed the parties to propose redactions of confidential or proprietary information by October 14, 2021. The plaintiff has informed the Court that it does not propose any redactions, and that the defendant also does not propose any redactions. (ECF 26.) Accordingly, the Court hereby releases in full the memorandum opinion of September 30.

agency-level protest.  The plaintiff seeks injunctive relief and has moved for judgment on the administrative record.

The defendant has moved to dismiss for lack of jurisdiction under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC").  The defendant asserts three primary grounds for dismissal: (1) that Congress has not waived sovereign immunity for judicial review of agency action under the SBIR program; (2) that this case does not involve a procurement as required to fall under this court's bid-protest jurisdiction; and (3) that the plaintiff does not have standing to bring a bid protest.  In the alternative, the defendant has cross-moved for judgment on the administrative record.

The Court rejects each of the defendant's asserted grounds for dismissal.  On consideration of the merits, however, the Court finds that the Navy's evaluation was not improper, and that the plaintiff has not carried its burden to demonstrate that the Navy acted arbitrarily or in bad faith.

Accordingly, the Court denies the defendant's motion to dismiss and the plaintiff's motion for judgment on the administrative record.  The Court grants the defendant's cross-motion for judgment on the administrative record.

## I.    BACKGROUND

### A.    Small Business Innovation Research Program

The SBIR program assists small businesses by providing federal support for research and development.  By establishing the SBIR program, Congress sought to support a "policy . . . that assistance be given to small-business concerns to enable them to undertake and to obtain the benefits of research and development in order to maintain and strengthen the competitive free enterprise system and the national economy."  15 U.S.C. § 638(a).  Agencies with extramural budgets of more than $100 million for research or research and development are required to set aside a portion of those budgets under the SBIR program to support research and development by small businesses.  *Id.* § 638(f)(1).

Under the SBIR program, participating agencies, among other things, determine categories of projects, issue solicitations, determine research topics, receive proposals and evaluate them, and make a final decision on each proposal.  *See id.* § 638(g).  All SBIR awards "must be awarded pursuant to competitive and merit-based selection procedures."  *Id.* § 638(s).

The Small Business Administration ("SBA") is required to "issue policy directives for the general conduct of the SBIR programs within the Federal government . . . ."  *Id.* § 638(j)(1).  The

administrative record in this case contains the relevant policy directive, which was issued May 2, 2019.[1]  (AR 1-152.[2])

In that policy directive, the SBA set out the three-phased process under the SBIR program uniform throughout the federal government.  (AR 16-33.)  "Phase I," the phase relevant to this case, "involves a solicitation of contract proposals or grant applications to conduct feasibility-related experimental or theoretical [research or research and development] related to described agency requirements."  (AR 20.)  Separate DoD components, including the Navy, defined their varied research requirements through a series of defined topics.  The SBA explained that "[t]he object of this phase is to determine the scientific and technical merit and feasibility of the proposed effort and the quality of performance of the [small-business concern] with a relatively small agency investment before consideration of further Federal support in Phase II."  (*Id.*)  Aside from exceptions not relevant here, only Phase I awardees are eligible to participate in Phase II of the SBIR program.  (AR 21.)  Because this case involves a Phase I solicitation, Phases II and III of the SBIR are not relevant.

Phase I of SBIR solicitations (as well as Phase II solicitations) must "satisfy any competition requirement of the Armed Services Procurement Act, the Federal Property and Administrative Services Act, and the Competition in Contracting Act."  (AR 28.)  The competition requirements "must be read in conjunction with the procurement notice publication requirements of § 8(e) of the [Small Business Act] (15 U.S.C. [§] 637(e))."  (AR 7.)

### B.     Broad Agency Announcement

On June 3, 2020, the DoD began accepting proposals in response to its SBIR 20.2 Program BAA.  (AR 153-83.)  The DoD's BAA provided the general requirements for participating in the DoD's SBIR program, and the Navy provided its own proposal submission instructions as part of the BAA.  (AR 153-83, 319-465.)

The DoD's BAA provided that Phase I proposals would be "evaluated and judged on a competitive basis[,] . . . initially screened to determine responsiveness[, and] . . . evaluated by engineers or scientists to determine the most promising technical and scientific approaches."  (AR 166.)  The DoD emphasized its discretion in selecting proposals: "DoD is under no obligation to fund any proposal or any specific number of proposals in a given topic.  It also may elect to fund several or none of the proposed approaches to the same topic."  (*Id.*)  Likewise, "[d]ue to limited funding, the [Navy] reserve[d] the right to limit the number of awards under

---

[1] The SBA's policy directive was updated on October 1, 2020.

[2] Citations to the administrative record (ECF 16) are cited as "AR" with the pagination reflected in the record.

any topic." (AR 324.) Phase I proposals selected for award would be "funded under negotiated contracts or purchase orders." (AR 166.)

Phase I evaluations were governed by the evaluation criteria ("Criteria A, B, and C") set out in the DoD's BAA:

> Selections will be based on best value to the Government considering the following factors which are listed in descending order of importance:
>
> > a. The soundness, technical merit, and innovation of the proposed approach and its incremental progress toward topic or subtopic solution.
> >
> > b. The qualifications of the proposed principal/key investigators, supporting staff, and consultants. Qualifications include not only the ability to perform the research and development but also the ability to commercialize the results.
> >
> > c. The potential for commercial (Government or private sector) application and the benefits expected to accrue from this commercialization.
>
> Cost reasonableness and realism shall also be considered to the extent appropriate.

(AR 177.) Considering these criteria, evaluators were to judge each proposal "on its own merit." (AR 166.) The Navy's instructions adopt the BAA's evaluation criteria "with technical merit being most important, followed by qualifications of key personnel and commercialization potential of equal importance." (AR 324.)

The plaintiff submitted a proposal to the Navy in response to SBIR Topic N202-133 ("Topic"), titled "Multimodal Interaction Technologies to Support Small Unit Leaders." (AR 438-39, 720-46.) The Topic's objective was to "[d]evelop a prototype system that leverages the current state-of-the-art in multimodal input/output (I/O) methodologies to control unmanned systems (UxS) at varying levels (i.e., from issuing broad tasking down to teleoperation) and to monitor status (i.e., see video from cameras, position on a map)." (AR 438.) The Topic explained its relevance by noting that "[a] number of unmanned systems are being deployed to the Fleet and Force, including Naval Special Warfare (NSW) operators and U.S. Marine Corps small unit leaders." (*Id.*)

Phase I under the Topic included "[d]etermin[ing] requirements for how warfighters will use companion UxS(s) in missions, focusing on NSW and Marine Corps squad leader use cases[,] [c]ollect[ing] information on various I/O methodologies[,] and determin[ing] how they can be integrated into a holistic UxS control and monitoring system." (*Id.*)

The Topic identified four deliverables in Phase I: "(1) use cases for warfighter and UxS teaming, (2) identification of control and monitoring systems for integration, (3) an understanding of the pros and cons of each I/O modality and associated human factors principles for design, and (4) mock-ups or a prototype of the system." (*Id.*)

In response to the solicitation for SBIR Topic N202-133, the Navy received 27 proposals, including the one from Squire. (AR 771.)  Four evaluators reviewed and evaluated the proposals with adjectival scoring and written summaries providing strengths and weaknesses for each evaluation criterion. (*E.g.*, AR 788-93 (providing the plaintiff's proposal evaluation summary).[3]

Because the record is confusing as to whether it contains the initial evaluation summary, the following discussion covers what is in the record.  Although the Court summarizes the record as pertaining to the initial evaluation, as noted in footnote 3, the Court may only have in the record the preliminary evaluations of the plaintiff's proposal from the Navy's re-evaluation.

Using several different methods of scoring the proposals, the evaluators compiled an evaluation matrix recording their preliminary scores for the proposals. (AR 771.)  Two evaluators used a 100-point scale, another used a ranking system with 1 being the best, and the other evaluator used a yes/no/maybe scoring system. (*Id.*)  The email attaching the evaluation matrix noted that the matrix would "provide a good start for discussion . . . ." (AR 770.)  Evaluator 1 ranked the plaintiff's proposal third on the evaluation matrix, and Evaluator 2 ranked it fifth. (AR 771.)  Evaluator 3 scored the plaintiff's proposal "NO," and Evaluator 4 scored it 57, placing the plaintiff's proposal in the bottom half of proposals. (*Id.*)

On September 8, 2020, the Navy notified the plaintiff that its proposal was not selected for award. (AR 799.)  Instead, the Navy intended to award contracts to BANC3, Inc.; Design Interactive, Inc.; VRTUL, Inc.; and Ravn, Inc. (*Id.*)

---

[3] According to the index in the administrative record (ECF 16-1), the evaluation summary for Squire's proposal starts on AR 788 and the re-evaluation of the proposal starts on AR 815. These appear, however, to be the same evaluation summaries. (*Compare* AR 788-93 *with* AR 815-20.)  Although the evaluators' written evaluations are grouped differently, the substance of the evaluations is the same, and the electronic signature logs for both bear the same signature dates.  The signatures are dated after the plaintiff received its first notice of non-selection, so the record appears to contain the evaluation summary from the re-evaluation, and the original evaluation summary appears to be missing from the record.

The plaintiff did not raise this discrepancy in its briefing, and it bases its arguments on the re-evaluation summary in the record.  Given that the original evaluation was supplanted by the re-evaluation, the Court finds that the discrepancy does not affect its ability to review the plaintiff's claims.

### C.     Protests

Challenging the Navy's evaluation and award decision, the plaintiff filed three protests before reaching this court.

#### 1.     Agency Protest

The plaintiff first filed an agency-level protest. (AR 800-13.) The plaintiff noted that more than one evaluator referred to the plaintiff's small size and lack of experience. (AR 800.) Those references, the plaintiff alleged, do not comport with the statutory basis of the SBIR program or FAR 15.305(a)(2)(iv), which pertains to evaluations of an offeror's past performance. (AR 800-01.) The plaintiff addressed the evaluations point by point, alleging, among other things, that the evaluators failed to credit certain strengths and described weaknesses outside the solicitation's criteria and the plaintiff's proposal. (*See generally* AR 800-13.)

In response to the plaintiff's protest, the Navy notified the plaintiff that it would be taking corrective action to re-evaluate the plaintiff's technical proposal. (AR 814.) The same evaluators re-evaluated the plaintiff's proposal, and the conclusion did not change. (AR 815-20.) The plaintiff received the following adjectival scoring in its proposal evaluation summary:

| Evaluator | Criterion A | Criterion B | Criterion C |
|:---:|:---:|:---:|:---:|
| 1 | Satisfactory | Satisfactory | Satisfactory |
| 2 | Satisfactory | Satisfactory | Satisfactory |
| 3 | Marginal | Marginal | Satisfactory |
| 4 | Satisfactory | Marginal | Satisfactory |

(AR 815.)

The Topic Chair did not recommend the plaintiff's proposal for award. (*Id.*) Although he acknowledged the plaintiff's "strong understanding of Special Operations Forces . . . mission challenges" and "great deal of relevant military experience," he noted several weaknesses:

> The proposal states that research, observation, and end user requirements will identify the most viable solution to this topic. While this is a potential approach, there is not a detailed amount of information that provides a clear-cut path to developing this solution, and the approach to identify other interaction technologies is lacking in detail.  For example, while "market research" will examine available input and output systems, there is no defined rubric to evaluate these technologies.  In addition, the two key personnel listed in . . . the proposal do not list previous experience

6

> relevant to this topic in human factors, UXS control software, and
> human/man-machine teaming.   As a result, this SBIR is not
> recommend [sic] for selection because of the limited innovation (i.e.
> voice as interface method, with little details to address broader
> technical challenges requested in the topic), and the increased risk
> associated with personnel without key experiences relevant to the
> topic – e.g. human factors, UXS control software, and human/man-
> machine teaming.

(*Id.*)  The Navy again decided not to fund the plaintiff's proposal.  (*Id.*)

The Navy notified the plaintiff by letter that its proposal was not selected for award upon re-evaluation.  (AR 821.)  The letter echoed the Topic Chair's summary, providing the following reason for not selecting the plaintiff's proposal:

> The proposal is not recommended for selection because of the
> limited innovation (i.e. voice as interface method, with little details
> to address broader technical challenges requested in the topic) under
> Criteria A [sic], and the increased risk associated with personnel
> without key experiences relevant to the topic – e.g. human factors,
> UXS control software, and human/man-machine teaming under
> Criteria B [sic].

(*Id.*)

## 2. First GAO Protest

After receiving the Navy's re-evaluation decision, the plaintiff filed a protest at the Government Accountability Office ("GAO").  (AR 826-57.)  The plaintiff alleged that (1) its proposal had not been evaluated in accordance with the terms of the solicitation; (2) the Navy did not apply the same standards among proposals; (3) the evaluation was unreasonable; and (4) Evaluator 2 was biased against the plaintiff, retaliating against it for filing its agency-level protest.  (AR 827.)

The plaintiff supported its new allegation of bias with a declaration.  (AR 856-57.)  The declarant averred that he had heard from an unnamed individual in the Naval Special Warfare Command Innovation Department that Evaluator 2 had "blacklisted" the plaintiff in the innovation office.  (AR 856.)  Evaluator 2 also allegedly notified his team that the plaintiff "had launched investigations and was 'trying to sue NSW.'"  (*Id.* (quoting the unnamed individual).)  When asked about the situation with the plaintiff on a separate occasion, the unnamed individual stated that "'it really does not matter…bottom line, [Evaluator 2] is going to pick whoever he wants to win.'"  (AR 857 (quoting the unnamed individual).)

The Navy again agreed to take corrective action.  (AR 858.)  It informed the GAO that it intended to "conduct an investigation of the acquisition, to include the allegations of improprieties contained in [the plaintiff's supporting declaration]."  (*Id.*)  The Navy requested

that the GAO dismiss the protest on the ground that the Navy's corrective action rendered the protest academic.  (*Id.*)  The GAO granted that request and dismissed the protest as academic.  *Squire Sols., Inc.*, B-419477 (Comp. Gen. Jan. 8, 2021) (unpublished decision).

The Navy investigated the plaintiff's allegations and summarized the findings in a memorandum.  (AR 859-69.)  "The scope of the investigation included procurement integrity and the allegations of bias raised by Squire in its GAO protest."  (AR 859.)  The primary witnesses were the four technical evaluators and the Topic Chair.  (AR 860.)  Because the declarant's allegations specifically named Evaluator 2, the secondary witness list consisted of all employees in his office.  (AR 864.)  Thirteen employees were emailed interview questions pertaining to the allegations of bias.  (*Id.*)  No witness was aware of any bias or had heard of any entity having been blacklisted from receiving an award.  (AR 860-67.)

The Navy concluded its investigation, determining "that no violations to the Procurement Integrity Act have occurred and the allegations of bias cannot be substantiated."  (AR 867.)  The Navy notified the plaintiff that after the investigation, it had "conducted a review of the prior evaluations of the four awardees' proposals, as well as the prior evaluation of [the plaintiff's] proposal, and determined that the prior evaluations are still valid."  (AR 871.)  The Navy informed Squire that it planned "to move forward with award to BANC3, Inc., Design Interactive, Inc., VRTUL, Inc., and Ravn, Inc."  (*Id.*)

### 3.    Second GAO Protest

The plaintiff then filed a second protest at the GAO.  (AR 938-74.)  The plaintiff re-alleged the same errors with the Navy's re-evaluation, including its allegation of bias and retaliation.  (AR 938-66.)  This time the plaintiff also alleged that the Navy's award to Ravn was an improper duplicate award.  (AR 966-69.)

To support its bias allegation, the plaintiff provided the GAO with two declarations, the one from the previous GAO protest and a new one.  (AR 973-74.)  The new declarant quoted an unnamed individual who allegedly worked with Evaluator 2.  (AR 974.)  The unnamed individual averred that Evaluator 2 had made it clear to his team that there was no merit to any claim that the plaintiff should be awarded a contract, that the plaintiff was causing drama by taking legal action, and that the plaintiff was blacklisted.  (*Id.*)

The Navy requested dismissal, and the GAO granted that request, in part.  (AR 984.)  The GAO dismissed the plaintiff's protest regarding its challenge to the Navy's evaluation of Criterion B; it found the allegations speculative.  (*Id.*)  The GAO also dismissed the plaintiff's challenge to Ravn's award because the plaintiff was not an interested party—Ravn's award would have no bearing on the Navy's award decision regarding the plaintiff.  (*Id.*)  The GAO declined to dismiss the remainder of Squire's second protest, including the bias allegation and Squire's challenges to the Navy's evaluation of Criteria A and C; these claims moved forward.  (*Id.*)

On June 10, 2021, the GAO denied the plaintiff's protest. *Squire Sols., Inc.*, B-419477.2, 2021 CPD ¶ 229, 2021 WL 2412783 (Comp. Gen. June 10, 2021).[4]  Upon review of the plaintiff's arguments, the GAO found "no basis to conclude that the Navy violated applicable solicitation provisions or regulations, or that the evaluation was otherwise unreasonable." *Id.* at *5.  The GAO also found no basis to conclude that the Navy's evaluation was tainted by bias. *Id.* at *6-9.  Instead, "the record reflects that [the plaintiff's] proposal was not funded due to legitimate concerns related to the evaluation criteria set forth in the BAA." *Id.* at *9.

### D.    Procedural History

On June 21, 2021, following the GAO's denial of the plaintiff's second protest, Squire filed its complaint in this court as a post-award bid protest.  (ECF 1.)  The complaint raises three claims: (1) that the Navy's evaluation and re-evaluation of the plaintiff's proposal, "and its ranking among other proposals received, w[ere] arbitrary, capricious, an abuse of discretion, not in accordance with law, and without the observance of procedures required by law" (*id.* ¶ 51); (2) that the evaluators exhibited bias and hostility toward the plaintiff, blacklisted the plaintiff, and retaliated against the plaintiff for filing a protest (*id.* ¶ 52); and (3) that the award to Ravn was unlawful (*id.* ¶ 53).[5]

On June 22, 2021, the Navy awarded contracts to BANC3, Inc.; VRTUL, Inc.; and Design Interactive, Inc.  (AR 872-901, 902-31, 932.)  The Navy intended to award a contract to Ravn, but Ravn declined the award.  (AR 934.)

At a June 25 status conference, the defendant stated that there is money available for funding of another proposal should there be merit to the plaintiff's claim.  The defendant also notified the plaintiff and the Court that Ravn had declined the award.  Because Ravn declined the award, the plaintiff made an unopposed oral motion to dismiss its third claim.  The Court granted that motion.  (ECF 14.)

The plaintiff has moved for judgment on the administrative record, seeking a permanent injunction, attorney's fees, proposal preparation costs, and any other available and appropriate relief.  (ECF 17.)  The defendant has moved to dismiss or, in the alternative, has cross-moved for judgment on the administrative record.  (ECF 18.)  The motions have been fully briefed.  The Court heard oral argument on September 9, 2021.

---

[4] The GAO's decision is also available in the administrative record at pages 1563 through 1572.

[5] In its second claim, the plaintiff also alleges violations of the first and fifth amendments of the U.S. Constitution.  (ECF 1, ¶ 52.)  Because the plaintiff did not mention these claims in its motion for judgment on the administrative record, it has waived these claims.  (*See generally* ECF 17.)

## II.     STANDARD OF REVIEW

### A.      Motion to Dismiss

The defendant has moved to dismiss the plaintiff's complaint for lack of subject-matter jurisdiction under RCFC 12(b)(1).[6] To determine jurisdiction, the "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The plaintiff has the burden of establishing jurisdiction by a preponderance of the evidence. *Id.* If the Court finds that it lacks subject-matter jurisdiction over the plaintiff's claim, RCFC 12(h)(3) requires the Court to dismiss the claim.

### B.      Motion for Judgment on the Administrative Record

On a motion for judgment on the administrative record under RCFC 52.1, the Court limits its review to the administrative record before it and makes findings of fact as if it were conducting a trial on a paper record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353-54 (Fed. Cir. 2005). Unlike a motion for summary judgment under RCFC 56, issues of material fact will not foreclose judgment on the administrative record. *Id.* at 1356. The Court determines "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018) (quoting *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006)).

## III.    JURISDICTION

The Tucker Act, 28 U.S.C. § 1491, establishes this court's jurisdiction. Specifically, section 1491(b)(1) provides this court jurisdiction over bid-protest matters:

> [T]he Unite[d] States Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a

---

[6] The defendant also moves to dismiss for failure to state a claim under RCFC 12(b)(6), but it is unclear which portion of the defendant's motion supports dismissal on those grounds. The defendant's argument that the plaintiff waived its challenges to the evaluation criteria would provide support if it were accepted. (*See* ECF 18 at 40-41.) The plaintiff, however, has clarified that the alleged inconsistency between the DoD's BAA and the Navy's instructions "is not the basis for any claims in this protest." (ECF 19 at 17.) Accordingly, the Court need not address the matter any further and will review the defendant's remaining arguments under the RCFC 12(b)(1) standard.

contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1). This provision "expressly waives sovereign immunity for claims against the United States in bid protests," covering "a broad range of potential disputes arising during the course of the procurement process." *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380 (Fed. Cir. 2012).

The defendant argues that this court lacks jurisdiction over the plaintiff's claims, raising three arguments: (1) Congress has not waived sovereign immunity to permit judicial review of the Navy's award decision under the SBIR program; (2) no procurement is at issue because the government is not acquiring property or services for its own benefit; and (3) even if a procurement is at issue, the plaintiff lacks standing to pursue its bid protest because it is not an interested party.

## 1. Sovereign Immunity

In bid protests, "the Tucker Act expressly waives sovereign immunity for claims against the United States . . . ." *Sys. Application & Techs., Inc.*, 691 F.3d at 1380; 28 U.S.C. § 1491(b)(1). Incorporating the standard of review from the Administrative Procedure Act ("APA"), section 1491(b)(4) provides that "the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(4).

Given the application of the APA's standard of review in bid protests, the defendant relies on a provision of the APA to argue that Congress has not waived sovereign immunity in this case. (ECF 18 at 20-24.) The APA precludes judicial review when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The defendant argues that the SBIR statute, 15 U.S.C. § 638, commits agency awards under the SBIR program to agency discretion, *i.e.*, it does not provide a standard for agencies to follow when awarding funds. (ECF 18 at 21-24.) The defendant then argues that because of the breadth of agency discretion, jurisdiction under the APA is lacking.

The defendant's argument is without legal basis. This case is a bid protest brought under the Tucker Act, 28 U.S.C. § 1491(b)(1), not the APA. The Tucker Act incorporates only the "standards set forth in section 706 of title 5," not the APA in its entirety. 28 U.S.C. § 1491(b)(4). Indeed, the Federal Circuit has held that 28 U.S.C. § 1491(b)(4) does not even incorporate section 706 in its entirety. *PGBA, LLC v. United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004). Instead, "section 1491(b)(4) only incorporates the arbitrary or capricious standard of review of section 706(2)(A)." *Id.* Accordingly, the APA's limitation under 5 U.S.C. § 701(a)(2) does not apply to actions brought under 28 U.S.C. § 1491(b) and does not deprive this court of jurisdiction. *See FFTF Restoration Co., LLC v. United States*, 86 Fed. Cl. 226, 238 n.16 (2009) (rejecting the application of 5 U.S.C. § 701(a)(2) in a bid protest); *Alion Sci. & Tech. Corp. v. United States*, 69 Fed. Cl. 14, 24-25 (2005) (same).

### 2.   Procurement

The Tucker Act grants the Court jurisdiction over disputes regarding "bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation *in connection with a procurement or a proposed procurement*." 28 U.S.C. § 1491(b)(1) (emphasis added).  The Federal Circuit has held that "relief under 1491(b)(1) is unavailable outside the procurement context."  *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010).  In other words, "1491(b)(1) in its entirety is exclusively concerned with procurement solicitations and contracts."  *Id.*  Although the Tucker Act does not define "procurement," the Federal Circuit has referenced two other related statutes to define the scope of the term.

First, the Federal Circuit has adopted the statutory definition of "procurement" found in 41 U.S.C. § 403(2), now codified at 41 U.S.C. § 111.  *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345-46 (Fed. Cir. 2008).  That statutory definition provides that "the term 'procurement' includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout."  41 U.S.C. § 111.

Second, in distinguishing between cooperative agreements and procurement contracts, the Federal Circuit has also given weight to the Federal Grant and Cooperative Agreement Act ("FGCAA"), which "'prescribe[s] criteria for executive agencies in selecting appropriate legal instruments . . . .'"  *Hymas v. United States*, 810 F.3d 1312, 1325 (Fed. Cir. 2016) (quoting 31 U.S.C. § 6301(2)) (brackets in original).  The FGCAA prescribes the following criteria for selecting a procurement contract:

> An executive agency shall use a procurement contract as the legal instrument . . . when--
>
>> (1) the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; or
>>
>> (2) the agency decides in a specific instance that the use of a procurement contract is appropriate.

31 U.S.C. § 6303.  This provision adds to the generic language of 41 U.S.C. § 111 the additional language "for the direct benefit or use of the United States Government."

Applying this framework, the defendant argues that the Court lacks jurisdiction because the SBIR program does not involve procurement contracts.  (ECF 18 at 24-29.)  The BAA provides that awards would be funded under negotiated contracts or purchase orders (AR 166), but the question put at issue by the defendant's motion to dismiss is whether the contract at issue is for a "procurement."  The defendant argues that (1) the government was not acquiring property or services, and (2) even if it was acquiring property or services, the acquisition of the work performed under the SBIR program is not for the direct benefit of the federal government. (ECF 18 at 24-29.)

### a.    Property or Services

The defendant argues that nothing in the DoD's BAA or the Navy's instructions suggests that the Navy was acquiring property or services.  (ECF 18 at 25-27.)  The Navy's portion of the DoD's BAA, however, supports the view that awards under this solicitation fall within the bid-protest jurisdiction of the Court of Federal Claims.

The BAA provides that "Phase I is to determine, to the extent possible, the scientific, technical, and commercial merit and feasibility of ideas submitted under the SBIR Program." (AR 157.)  Further, the Navy's instructions explain that "[c]ontract deliverables for Phase I are typically a kick-off brief, progress reports, and a final report."  (AR 324.)  Although Phase I focuses on the early stages of development, the Navy has broad discretion over how to administer the SBIR program.  *See* 15 U.S.C. § 638(g).

Under the SBIR statute, the Navy must determine categories of projects, issue solicitations, determine research topics, receive proposals, evaluate the proposals received, and make a final decision on each proposal.  *See id.*  Consistent with that discretion, each of the SBIR topics in the Navy's instructions had its own contract deliverables to address the specific needs of the focus area.  (*See generally* AR 330-463.)

Under the Topic at issue here, the Navy identifies four Phase I deliverables: "(1) use cases for warfighter and UxS teaming, (2) identification of control and monitoring systems for integration, (3) an understanding of the pros and cons of each I/O modality and associated human factors principles for design, and (4) mock-ups or a prototype of the system."  (AR 438.)

The fact that the Topic focuses on research and development does not preclude it from being a procurement.  The Request for Information ("RFI") considered by the Federal Circuit in *Distributed Solutions* expressly provided "that it was 'for market research purposes only' and would 'not result in a contract award' . . . ."  539 F.3d at 1346.  Even though the government ultimately decided not to procure anything under that RFI, the Federal Circuit held that the Tucker Act "does not require an actual procurement."  *Id.*  Instead, the Tucker Act "explicitly contemplates the ability to protest these kinds of pre-procurement decisions by vesting jurisdiction in the Court of Federal Claims over 'proposed procurements.'  A proposed procurement, like a procurement, begins with the process for determining a need for property or services."  *Id.*

The Phase I Topic at issue here, even as a developmental stage, could be construed as a pre-procurement decision.  A contractor must pass through each phase to reach the next, and Phase III focuses on commercialization, both to the Navy and to the private sector, of the technology created under the program.  (AR 439.)  Aside from the pre-procurement qualities of the solicitation, the Phase I Topic itself includes property as a deliverable.

In the context of a dispute under the Contract Disputes Act, the Federal Circuit has held that a purchase order for a prototype is a procurement contract.  *Wesleyan Co. v. Harvey*, 454 F.3d 1375, 1378-79 (Fed. Cir. 2006).  With one exception not relevant here, the Contract

Disputes Act, like the Tucker Act's bid-protest jurisdiction, applies only to procurements. 41 U.S.C. § 7102(a).

In the Topic to which Squire responded, the fourth deliverable, "mock-ups or a prototype of the system," makes the Topic unique among the Navy's various SBIR topics in the DoD's BAA at issue. Many of the Navy's topics include prototype plans as a Phase I deliverable, but this Topic appears to be the only one that required an actual mock-up or a prototype as a Phase I deliverable. (*See generally* AR 330-463.) Following *Wesleyan*, the mock-up or prototype required by the Navy's Topic to which Squire submitted a proposal is property. An agreement that requires an awardee to produce a mock-up or prototype is therefore a contract for the procurement of goods.

The defendant relies heavily on a decision of this court that held that an SBIR Phase II Source Selection Plan did not involve a procurement. *R & D Dynamics Corp. v. United States*, 80 Fed. Cl. 715, 720-22 (2007), *aff'd*, 309 F. App'x 388 (Fed. Cir. 2009). The decision in *R & D Dynamics* is distinguishable and provides no help to the defendant given the facts of this case. After considering the broad purposes of the SBIR program, Judge Hewitt in *R & D Dynamics* rested her decision on the specific Source Selection Plan at issue in the case. *Id.* The Source Selection Plan there specifically distinguished "R & D projects" from "[p]rocurement projects" and expressly provided that "Topics will solicit R & D and not procurement." *Id.* at 721. The decision is silent on the matter of deliverables, and so too, presumably, was the solicitation.

Here, neither the DoD's BAA nor the accompanying Navy's instructions contained similar language providing that the topics were not procurements. In fact, the BAA itself is replete with indicia that awards under it were subject to the FAR and thereby would be procurements. The Navy's own solicitation at issue supports that conclusion. The Navy had control over how it constructed its solicitations. As it did with all the other topics under this BAA, the Navy could have avoided requiring a mock-up or prototype for the Topic at issue; instead, it required one to be produced. The SBIR Topic to which Squire submitted a proposal specifically requested proposals for a contract with a mock-up or prototype as a deliverable. Based on the specific terms of the Topic to which Squire submitted a proposal—terms the Navy itself developed—the Court finds that, in accordance with the Federal Circuit's decision in *Wesleyan*, the Topic solicited a contract for property.

**b.    Direct Benefit**

The defendant also argues that, even if the Navy was acquiring property or services, the contract is not for the direct benefit or use of the government—in other words, "the Navy is not the primary beneficiary of the work the awardees will perform under their SBIR contracts." (ECF 18 at 27.) This argument too is not consistent with the Navy's Topic to which Squire submitted its proposal.

The Topic at issue here focuses on developing technologies to support warfighters. (AR 438-39.) Its title even reflects this focus: "Multimodal Interaction Technologies to Support Small Unit Leaders." (AR 438.) The Topic explains that "[a] number of unmanned systems are being deployed to the Fleet and Force, including [NSW] operators and U.S. Marine Corps small

unit leaders." (*Id.*)  Phase I sought to "[d]etermine requirements for how warfighters will use companion UxS(s) in missions, *focusing on NSW and Marine Corps squad leader use cases*." (*Id.* (emphasis added).)

Implying that the private sector is the primary beneficiary of SBIR awards, the defendant notes that commercialization is a goal in Phase III of the Topic.  (*See* ECF 18 at 27; ECF 22 at 10.)  Commercialization, however, does not preclude the Navy from deriving benefit from the development of products funded by the SBIR program.  The SBIR statute defines "commercialization" to include "the production and delivery . . . of products, processes, technologies, or services for sale to or use *by the Federal Government or commercial markets*." 15 U.S.C. § 638(e)(10) (emphasis added).  Indeed, the Topic's Phase III section is titled "Phase III Dual Use Applications." (AR 439 (capitalization modified).)  That section lists the benefits to the Navy and the private sector.  (*Id.*)  In Phase III, the Navy stands to be a beneficiary under the Topic, which requires the contractor to "[s]upport the customer (NSW or Marine Corps) in transitioning the technology for use[, and] [f]urther develop the software and hardware system for evaluation to determine its effectiveness in the field for NSW or Marine Corps scenarios." (*Id.*)

Considering that the Topic focused on developing technology for the NSW and Marine Corps small-unit leaders, the Navy would receive a direct benefit under the contract, and the Navy's application of the technology for its own purposes appears to be the primary focus of the Topic.  The DoD's BAA also indicates that the private-sector potential is secondary: "Proposers are encouraged to consider whether the research or research and development being proposed to DoD Components also has private sector potential, either for the proposed application or as a base for other applications." (AR 157.)

The Navy's SBIR Topic at issue sought to acquire property—in the form of a mock-up or prototype—for the direct benefit or use of the Navy.

### c.   Further Indicia of a Procurement

Other factors indicate that this solicitation was a procurement, including references to the FAR and procurements in the SBA's policy directive and the DoD's BAA.

The SBA's policy directive is replete with references to the Federal Acquisition Regulations ("FAR").  (*See* AR 1-152.)  For example, the directive provides that "[i]nterested parties have the right to protest as prescribed in FAR 33.106(b) and FAR 52.233-2."[7]  (AR 165.) The directive also noted that "[t]he type of Funding Agreement (contract, grant, or cooperative agreement) is determined by the awarding agency. . . .  Contracting agencies may issue SBIR[ ]

---

[7] The GAO's jurisdiction is also limited to procurement matters, but this case has been to the GAO twice before reaching this court.  The GAO did not dismiss either protest for not involving a procurement.

awards as fixed price contracts . . . or cost type contracts, *consistent with the FAR and agency supplemental acquisition regulations.*" (AR 49 (emphasis added).)

The DoD's BAA at issue in this case likewise references the FAR:

> Upon award of a contract, the contractor will be required to make certain legal commitments through acceptance of Government contract clauses in the Phase I contract. The outline [of such clauses] is illustrative of the types of provisions required by the [FAR] that will be included in the Phase I contract.

(AR 179-80.)

If there are required FAR provisions, then it must be a procurement. The FAR applies to all acquisitions, a term which is synonymous with procurements. *See* FAR 1.101 ("The [FAR] System is established for the codification and publication of uniform policies and procedures for acquisition by all executive agencies."); FAR 2.101 (defining a procurement by reference to its definition of acquisition).

The SBA's 2019 policy directive referenced the term "procurement." The directive provides that SBIR solicitations for Phases I and II must "satisfy any competition requirement of the *Armed Services Procurement Act*, the Federal Property and Administrative Services Act, and the Competition in Contracting Act." (AR 28 (emphasis added).)

The DoD's BAA also referenced the term "procurement." The BAA contains a notice that federal law "prohibits entering into a contract for the *procurement of products or services* with any person" who does business in or with Venezuela. (AR 181 (emphasis added).) There would be no reason to include such a notice if the SBIR awards made under the DoD's BAA were not themselves "procurements" to which this legal prohibition was applicable. [8]

---

[8] The Contracts vs. Grants tutorial on the sbir.gov website makes the point more explicit. *See* Course 1, Tutorial 6: Contracts vs. Grants, *available at* https://www.sbir.gov/sites/all/themes/sbir/dawnbreaker/img/documents/Course1-Tutorial6.pdf. After explaining that the participating agencies can make their awards either as grants or contracts, the tutorial describes the choice to use a contract:

> By contrast [to grants], contracts are more demanding. A contracting Agency is looking to procure a good or service that will be of direct benefit to the government. There are five contracting Agencies that participate in the SBIR . . . program, with the largest

Finally, applicants for awards under the DoD's BAA at issue had to be registered in the System for Award Management ("SAM").  (AR 168.)  With certain exceptions not relevant here, the FAR requires that all bidders or awardees of government procurements be registered in the SAM.  FAR 2.101; 4.11.  The requirement that bidders be registered in the SAM supports the inference that SBIR awards under the BAA are procurements.

The defendant's jurisdictional argument is too general, presenting an all-or-nothing argument that a contract under the SBIR program (or at least Phase I) is never a procurement contract covered by this court's bid-protest jurisdiction.  Under the specific facts of this solicitation, the defendant's argument applies the Tucker Act's "procurement" requirement too narrowly.  The language in 28 U.S.C. § 1491(b)(1) is given a broad scope: "a narrow application of section 1491(b)(1) does not comport with the statute's broad grant of jurisdiction over objections to the procurement process." *Sys. Application & Techs., Inc.*, 691 F.3d at 1381.  Squire's challenge to the Navy's decision under the Topic to which Squire responded under this BAA is "in connection with a procurement." *See* 28 U.S.C. § 1491(b)(1).  Accordingly, the plaintiff's claims fall within the grant of jurisdiction to the Court of Federal Claims to resolve bid protests.

### 3.   Standing

The defendant also argues that, even if a procurement is at issue, the plaintiff lacks standing to pursue its bid protest because it is not an interested party.  (ECF 18 at 29–36.)

To establish standing under this court's bid-protest jurisdiction, a protestor must be an "interested party."  28 U.S.C. § 1491(b)(1).  The Federal Circuit has interpreted this term to require a protestor "to establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  Here, the first prong is not at issue because the plaintiff is an actual bidder.  (*See* AR 720-46 (providing the plaintiff's proposal).)

To establish the required economic interest under the second prong, a court must decide whether the protestor was prejudiced by the alleged errors. *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996).  To establish prejudice in a post-award bid protest, the protestor must "show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  Allegations based on conjecture "are

---

being the [DoD] and the National Aeronautics and Space Administration.

*Id.* at 2.  Here, the DoD chose the contract approach (AR 160); the BAA explained that Phase I proposals selected for award would be "funded under negotiated contracts or purchase orders." (AR 166.)

insufficient to show [a protestor] had a substantial chance of winning the award." *HVF W., LLC v. United States*, 846 F. App'x 896, 898 (Fed. Cir. 2021).

In this case, the standing analysis must consider the specifics of the SBIR program. Although the Phase I process was competitive, the Navy did not award contracts sequentially, *i.e.*, the award of one contract did not preclude another award to a bidder with a proposal deemed worthy. *See* 15 U.S.C. § 638(s) (requiring competitive and merit-based selection procedures). The Navy had funding for up to five awards, although it had no obligation to fund any proposals. (*See* AR 1416 (noting that there was funding for an award to the plaintiff, if the evaluators found the proposal worthy of funding after reconsideration); AR 324 ("Due to limited funding, the [Navy] reserves the right to limit the number of awards under any topic.").) Despite having the funding, the Navy chose not to fund the plaintiff's proposal based on its evaluation and re-evaluation of that proposal. (AR 799, 821.) The BAA similarly provided that "[e]ach proposal will be judged on its own merit." (AR 166.) *See also* FAR 35.016(d) ("Written evaluation reports on individual proposals will be necessary but proposals need not be evaluated against each other since they are not submitted in accordance with a common work statement.").[9]

The plaintiff argues that it would have received an award if not for errors in the Navy's evaluation. (ECF 19 at 14-16.) For the limited purpose of determining whether it has standing, the plaintiff's allegations are assumed to be true. *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221 (Fed. Cir. 2019) ("For standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions."); *L-3 Commc'ns Corp. v. United States*, 99 Fed. Cl. 283 (2011) ("[T]he prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true.").

The plaintiff alleges that both errors and bias tainted the Navy's evaluation of its proposal. If not for the alleged errors, the plaintiff argues, it would have had a substantial chance at award. The preliminary result of the original evaluations is reflected in the evaluation matrix. (AR 771.) Evaluators 1 and 2 ranked the plaintiff's proposal among the top five; Evaluators 3 and 4 did not consider the plaintiff a top contender for funding. (*Id.*) Evaluator 3 scored the plaintiff's proposal "NO," and Evaluator 4's score placed the plaintiff's proposal in the bottom half of proposals. (*Id.*). Although the technical evaluators were split, funding was available for up to five awards, and two of the evaluators placed the plaintiff among the top five.

If the plaintiff were able to demonstrate, under the facts in the record, either an arbitrary evaluation process or bias in the Navy's evaluation, then injunctive relief could give the plaintiff a substantial chance at receiving an award. The plaintiff is not required to show that it, in fact, would receive the award; that showing is too high a threshold for the standing inquiry. Moreover, prevailing on standing does not guarantee that the plaintiff can demonstrate prejudice on the merits if errors were found; instead, the standing determination is a preliminary matter

---

[9] FAR 35.016 governs broad agency announcements.

based only on allegations, not findings.  The standard the defendant seeks to impose on Squire is another mechanism for depriving the court of jurisdiction to hear claims under the SBIR program.  Under the BAA and the Topic at issue, this defense has already been rejected.  Likewise, the defendant's standing argument is rejected.  The plaintiff has made the requisite showing that it is an interested party and, therefore, has standing to challenge the Navy's failure to award it a contract under the DoD's SBIR BAA.

## IV.   DISCUSSION

On the merits, the plaintiff raises two claims: (1) the Navy's evaluation and re-evaluation of the plaintiff's proposal, "and its ranking among other proposals received, w[ere] arbitrary, capricious, an abuse of discretion, not in accordance with law, and without the observance of procedures required by law" (ECF 1, ¶ 51); and (2) the evaluators showed bias and hostility against the plaintiff and blacklisted and retaliated against it for filing its protest (*id.* ¶ 52).

### A.   Arbitrary and Capricious Evaluation

The Court evaluates bid protests under the APA's standard of review.  *See* 28 U.S.C. § 1491(b)(4) (incorporating the standard of 5 U.S.C. § 706).  Under that standard, an agency's procurement action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  The Court may grant relief only upon the finding that "the procurement official's decision lacked a rational basis" or "the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001).

The plaintiff alleges that the Navy's evaluation and re-evaluation of the plaintiff's proposal, "and its ranking among other proposals received, w[ere] arbitrary, capricious, an abuse of discretion, not in accordance with law, and without the observance of procedures required by law." (ECF 1, ¶ 51.)  The plaintiff argues, among other things, that the evaluations did not follow FAR part 15 or the terms of the BAA.[10]  (ECF 17 at 1-2.)

There is no basis in this record to determine that the Navy's technical evaluation was improper or arbitrary and capricious.

The Court's review of a procuring agency's decision is "highly deferential."  *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  The Court will not

---

[10] The Court rejects the plaintiff's objections to the evaluation based on FAR part 15, including the plaintiff's claim that the BAA was a best-value procurement under FAR part 15.  Although the DoD's BAA noted that awards would "be based on best value to the Government" (AR 177), the BAA did not provide that awarding the SBIR funding under the BAA was a FAR part 15 procurement (*see generally* AR 153-83, 319-465).  *See Glob. Aerospace Corp.*, B-414514, 2017 CPD ¶ 198, 2017 WL 2859927, at *6-7 (Comp. Gen. July 3, 2017) (finding that SBIR procurements are not conducted under FAR part 15's competitive procedures but, nonetheless, use other competitive procedures).

second-guess "discretionary determinations of procurement officials" involved in challenges that "deal with the minutiae of the procurement process in such matters as technical ratings." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).

The SBIR program is governed by 15 U.S.C. § 638, the SBA's policy directive, and the participating agencies' solicitations. "Proposals received as a result of the BAA shall be evaluated in accordance with evaluation criteria specified therein through a peer or scientific review process." FAR 35.016(d).

The Navy here had broad discretion under the DoD's BAA to determine which proposals it would fund. The BAA provided that "[p]roposals passing th[e] initial screening [for responsiveness] will be technically evaluated by engineers or scientists to determine the most promising technical and scientific approaches." (AR 166.) Under the BAA, proposals are "evaluated and judged on a competitive basis," considering three criteria:

> a. The soundness, technical merit, and innovation of the proposed approach and its incremental progress toward topic or subtopic solution.

> b. The qualifications of the proposed principal/key investigators, supporting staff, and consultants. Qualifications include not only the ability to perform the research and development but also the ability to commercialize the results.

> c. The potential for commercial (Government or private sector) application and the benefits expected to accrue from this commercialization.

(AR 166, 177.) The Navy's instructions adopt these criteria, clarifying that Criterion A is most important, followed by Criteria B and C of equal importance. (AR 324.)

Point by point, the plaintiff alleges numerous specific evaluation errors, challenging seemingly every weakness identified by the evaluators and noting strengths allegedly ignored. (ECF 17 at 20-29.) The Court notes a few representative examples regarding Criterion A. The plaintiff speculates that Evaluator 1's cited weakness that the proposal lacked detail to provide a path to developing a solution to the research topic would hold true for virtually any offeror. (*Id.* at 20.) Evaluator 1 also allegedly failed to note the plaintiff's joint letter of endorsement as a strength.[11] (*Id.* at 20-21.) The plaintiff speculates that Evaluator 2's voice-technology concern would be equal for all offerors. (*Id.* at 22.) Evaluator 3 allegedly disregarded "numerous elements" of the plaintiff's proposal that are "clear strengths." (*Id.* at 24.) Finally, the plaintiff alleges that Evaluator 4 mistakenly referred to the plaintiff's system "as it had been deployed at

---

[11] The plaintiff's "joint letter of endorsement" is a letter from NSW Innovation, Special Operations Command, and Air Force Special Warfare components supporting the plaintiff's qualifications. (*See* AR 1258 (providing Evaluator 2's explanation that his office signed a letter of support for the plaintiff in early 2020).) The letter does not appear to be in the record.

the time of the proposal," rather than the ultimate system resulting from the proposed research effort.  (*Id.* at 25 (emphasis omitted).)  The plaintiff notes that Evaluator 4 did not make that alleged mistake for any of the awardees.  (*Id.* at 26.)  Alleging similar errors under Criteria B and C, the plaintiff merely incorporates its objections by reference to its second GAO protest.  (*Id.* at 27-29; *see also* AR 957-66.)

The strengths and weaknesses identified by the evaluators were consistent with the BAA's criteria, as summarized by the Topic Chair.  (*See* AR 815.)  Regarding Criterion A, the Topic Chair noted that "there is not a detailed amount of information that provides a clear-cut path to developing [the plaintiff's proposed] solution, and the approach to identify other interaction technologies is lacking in detail."  (*Id.*)  Regarding Criterion B, the Topic Chair credited the plaintiff for "a strong understanding of Special Operations Forces . . . mission challenges" and for its "great deal of relevant military experience."  (*Id.*)  The Topic Chair noted, however, that "the two key personnel listed in . . . the proposal do not list previous experience relevant to this topic in human factors, UXS control software, and human/man-machine teaming."  (*Id.*)  Based on the stated weaknesses regarding Criteria A and B, the Topic Chair did not recommend the plaintiff's proposal for selection.  (*Id.*)  The weaknesses outweighed the strengths.

In the absence of any indication that the evaluators considered criteria that were not spelled out in the Topic, the Court will not put its thumb on the scale; the technical evaluators are the experts and are in a better position to weigh the strengths and weaknesses of a proposal.  That is especially true for a proposal that is intended to be highly innovative and focused on specialized technology.  The evaluation of the plaintiff's proposal required technical expertise. In such instances, the discretionary judgment is best left to the agency officials with appropriate expertise.  *See, e.g.*, *Kinemetrics, Inc. v. United States*, No. 21-1626, 2021 WL 4237169 at *7 (Fed. Cl. Sept. 10, 2021); *Terex Corp. v. United States*, 104 Fed. Cl. 525, 532 (2012).  The plaintiff's challenges to the Navy's evaluation all involve the "minutiae of the procurement process in such matters as technical ratings . . . which involve discretionary determinations of procurement officials that a court will not second guess."  *E.W. Bliss Co.*, 77 F.3d at 449; *see also COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383-84 (Fed. Cir. 2012) (declining to second guess an agency's Quality/Capability ratings).

Squire also argues that the discrepancy among the evaluators' ratings supports its argument that the evaluation of its proposal was arbitrary and capricious.  (ECF 17 at 1.)  It is true that the four evaluators had disparate views of the plaintiff's proposal.  Two evaluators were relatively favorable toward it; two were relatively negative.  The mere existence of that discrepancy does not support the plaintiff's argument.  In fact, disparate views among evaluators ought to be the expected outcome when experts are asked to review innovative research and development projects.  On its own, the existence of disparate perspectives on Squire's proposal does not demonstrate that the evaluations themselves were irrational or arbitrary and capricious. In such a highly technical area, it is not for this Court to re-weigh the outcome of the evaluation.

Ultimately the Court is left with the plaintiff's assertion that its proposal merited better ratings.  The Court's role is not to referee such disagreements.  "'The arbitrary and capricious standard applicable [in bid protests] is highly deferential.'"  *Glenn Def. Marine (ASIA), PTE Ltd.*

*v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) (quoting *Advanced Data Concepts*, 216 F.3d at 1058) (modification in original).  On this record, Squire has not shown that the Navy's technical evaluations here were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  *See* 5 U.S.C. § 706(2)(A).

### B.      Bias or Retaliation

Courts presume that government officials "carry out their duties in good faith . . . [and] [u]nsubstantiated suspicions and allegations are not enough" to overcome that presumption. *Spezzaferro v. F.A.A.*, 807 F.2d 169, 173 (Fed. Cir. 1986).  To overcome the presumption of the government's good faith, the Federal Circuit has adopted the "clear and convincing" burden of proof.  *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002).  "Clear and convincing evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is '*highly probable*.'"  *Id.* at 1240 (quoting *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993)) (emphasis in original).

The plaintiff alleges that the evaluators exhibited bias and hostility toward the plaintiff, blacklisted the plaintiff, and retaliated against it for filing its agency-level protest.  (ECF 1, ¶ 52.)  The plaintiff presents the two declarations that it had submitted to the GAO in earlier protests and several emails written by the evaluators.

Both declarations quote unnamed individuals who allegedly worked with Evaluator 2. (AR 856-57, 973-74.)  The first declaration quoted an unnamed individual claiming that Evaluator 2 had "blacklisted" the plaintiff in the innovation office, and that Evaluator 2 allegedly notified his team that the plaintiff "had launched investigations and was 'trying to sue NSW.'" (AR 856 (quoting the unnamed individual).)  The first declaration also quoted the unnamed individual stating that Evaluator 2 "'is going to pick whoever he wants to win.'"  (*Id.* (quoting the unnamed individual).)  The second declaration quoted an unnamed individual asserting similar allegations, including that Evaluator 2 told his team that the plaintiff was causing drama by taking legal action and that the plaintiff was blacklisted.  (AR 974.)

The plaintiff highlights emails expressing frustration with the protest process during the plaintiff's second protest at the GAO.  (ECF 17 at 12-15; *see also* AR 1326-63.)  For example, Evaluator 2 wrote that "If they can continue to protest indefinitely I don't know if there is a point. . . . On a personal note, having baseless accusations thrown at me for the first time in my entire career isn't doing a lot for my confidence in the process."  (AR 1336.)  Another email asked, "How many times can they protest?" and stated concern that "they are out to get even at this point."  (AR 1331.)  The Topic Chair replied, "I think we all feel the frustration . . . ."  (*Id.*)

Neither the declarations nor the emails provide adequate support for the plaintiff to overcome its burden.  The two declarants did not have any first-hand knowledge of bias; instead, they quote an unnamed individual or individuals who allegedly worked with Evaluator 2.  The emails are not clear and convincing evidence of bias.  First, the emails date from the time of the second GAO protest, long after the supposed bias infected the award.  They are therefore not probative of the state of mind of any evaluator at the time of the initial evaluation or the Navy's

re-evaluation, which is the decision at issue.  Second, outside a few statements of frustration, the emails indicate on their face that the evaluators remained impartial and rested their re-evaluation on the merits of the plaintiff's proposal.  For example, in one email (not cited by the plaintiff) regarding the re-evaluation, the Topic Chair told the evaluators: "To be clear, we can also accept the proposal without losing any of the other accepted proposal submissions.  Although, the weakness [sic] still outnumber the strengths."  (AR 1356.)

The Navy investigated the plaintiff's allegations of bias.  The primary witnesses were the four technical evaluators and the Topic Chair.  (AR 860.)  Although the Navy did not interview the declarants of the declarations the plaintiff submitted to the GAO, the investigator's secondary witness list consisted of all employees in Evaluator 2's office, which would have included the unnamed individual or individuals allegedly quoted in the declarations.[12]  (*See* AR 864.)  Thirteen employees were contacted and received by email interview questions pertaining to the allegations of bias; no witness reported being aware of any bias in the evaluation or hearing of any firm being blacklisted from receiving an award.  (AR 860-67.)  Based on its investigation, the Navy determined "that no violations to the Procurement Integrity Act have occurred and the allegations of bias cannot be substantiated."  (AR 867.)

The Court finds the Navy's investigation to have been reasonable, and its conclusions are consistent with the evidence uncovered.  The plaintiff has failed to put forward facts that undercut the Navy's conclusions rejecting the claim that bias affected the evaluation of Squire's proposal.  Instead of putting clear and convincing evidence of bias before the Court, the plaintiff offers only allegations of bias without supporting facts.  Squire has not overcome the presumption that the Navy acted in good faith.

## V.     CONCLUSION

The SBIR program gives the participating agencies broad discretion in administering the program.  The Navy structured the Topic at issue in this case in a way that constitutes a procurement for the purposes of establishing this court's jurisdiction.  Under the SBIR program's

---

[12] The plaintiff seeks to undercut the Navy's investigation by noting that the two declarants themselves were never interviewed.  (ECF 17 at 11-12.)  The declarants, however, could have imparted nothing but hearsay to the investigator.  Instead, the investigator necessarily would have interviewed the person or persons with direct knowledge when she contacted everyone who worked in Evaluator 2's office.  That fact distinguishes the investigation conducted by the Navy here with the investigation found to be flawed in *Oak Grove Techs., Inc. v. United States*, No. 21-775, 2021 WL 3627111, at *5 (Fed. Cl. Aug. 2, 2021) (noting that the investigator failed to interview persons who had been employed by winning bidder who alleged bias in the award decision).  It would have been better in this case had the investigator interviewed the two declarants, if only to be able to identify the alleged source of their information and question that individual more effectively.  By interviewing every employee in Evaluator 2's office, however, the investigator necessarily contacted the alleged source or sources for the declarants, and the source or sources did not corroborate the information alleged in the declarations.

broad discretion, agencies have unfettered ability to avoid the constraints of a bid protest, but here the Navy opened itself up to this suit by structuring the Topic as a procurement.  Even as a procurement, however, the BAA provided the Navy with broad discretion to fund or not to fund proposals, and the technical evaluators were given few criteria to choose proposals, leaving the evaluators generally free to exercise their own discretion and apply their own expertise to choose which proposals were worthy of funding.

The Court finds that the Navy acted within its discretion, and that the plaintiff has not shown bias.  Because the plaintiff has not succeeded on the merits, it has failed to satisfy the standards for receiving injunctive relief.  *See PGBA, LLC*, 389 F.3d at 1229 (requiring success on the merits as the first consideration in deciding whether to issue a permanent injunction).[13]

The Court denies the defendant's motion to dismiss under RCFC 12(b)(1) but grants the defendant's cross-motion for judgment on the administrative record under RCFC 52.1.  The plaintiff's motion for judgment on the administrative record is denied.

The Court will issue an order in accordance with this memorandum opinion.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**

---

[13] Even if the Court had found for the plaintiff on the merits, given the Navy's broad discretion under the SBIR program, any injunction could have directed the Navy to re-evaluate Squire's proposal only if the Navy decided to exercise its discretion to make more awards.